**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LSV ENTERTAINMENT, LLC,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:24-cv-1867** |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **EDDIE BARBER, *et al.*,** | : | **Magistrate Judge S. Courter Shimeall** |
| | : | |
| **Defendants.** | : | |
| | : | |

**OPINION AND ORDER**

This is a Copyright Act case arising out of a dispute over the entitlement to "featured artist" royalties collected by SoundExchange, Inc. for performances of the recordings of two bands, "Zapp" and "Roger." Plaintiff LSV Entertainment, LLC is the royalty administrator retained by members of the Troutman family. Most of the defendants, including lead Defendant Eddie Barber, have defaulted, and this Court entered a default judgment against them on March 17, 2025. (ECF No. 40). Now, Plaintiff seeks declaratory and injunctive relief against the remaining Defendant, Bobby Glover, to prevent him from claiming featured artist royalties for either Zapp or Roger from SoundExchange. Plaintiff moved for summary judgment on the merits, and requested in the alternative that this Court strike Glover's answer and enter default judgment. (ECF No. 45). For the following reasons, Plaintiff's Motion is **GRANTED** in part and **DENIED** in part. Defendant Glover may "wanna share [Zapp & Roger's] treasure,"[1] but Plaintiff has shown that there is no dispute that Glover was not a featured artist within the meaning of the Copyright Act.

[1] Zapp, *Computer Love*, *on* The New Zapp IV U at 1:58–2:01 (Spotify, Warner Bros. Records, Inc. Oct. 25, 1985).

# I. BACKGROUND

## A. Statutory Background

Under the Copyright Act, the owner of a copyrighted sound recording has "the exclusive rights" to reproduce, derive from, distribute copies of, and perform publicly by means of a digital audio transmission. 17 U.S.C. § 106(1)–(3), (6); *see* 17 U.S.C. § 114(a). The law and its subsequent enactments "created a compulsory statutory license regime" for the use of copyrighted work, including music. *SoundExchange, Inc. v. Muzak, LLC*, 322 F. Supp. 3d 72, 74 (D.D.C. 2018).

As relevant here, the Copyright Act contemplates the collection and payment of royalty fees when copyrighted music is used. In doing so, it draws an important distinction between "featured" recording artists and "nonfeatured" vocalists and musicians. The Act provides that "a nonprofit collective designated by the Copyright Royalty Judges to distribute receipts from the licensing of transmissions . . . shall distribute such receipts as follows:"

> (A) 50 percent of the receipts shall be paid to the copyright owner of the exclusive right under section 106(6) of this title to publicly perform a sound recording by means of a digital audio transmission.
>
> (B) 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) to be distributed to nonfeatured musicians (whether or not members of the American Federation of Musicians) who have performed on sound recordings.
>
> (C) 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any successor entity) to be distributed to **nonfeatured vocalists** (whether or not members of the American Federation of Television and Radio Artists) who have performed on sound recordings.
>
> (D) 45 percent of the receipts shall be paid, on a per sound recording basis, to the **recording artist or artists featured** on such sound recording (or the persons conveying rights in the artists' performance in the sound recordings).

17 U.S.C. § 114(g)(2) (emphasis added).

Thus, the Copyright Act provides for royalties on licensing receipts. A 45% royalty is paid directly to featured recording artists. By contrast, nonfeatured musicians and nonfeatured vocalists receive only an interest in escrow accounts each containing funds from a 2.5% royalty. The Copyright Royalty Judges designated SoundExchange, Inc. to receive "and to distribute royalty payments" to performers, including nonfeatured vocalists, "entitled to receive royalties" under 17 U.S.C. § 114(g). 37 C.F.R. § 380.4(d)(1).

### B. Factual Background

#### *1. Undisputed Facts*

Zapp and Roger are two American bands formed by the Troutman brothers in Dayton, Ohio in the late 1970s and early 1980s. (*See* Glover Dep., ECF No. 45-12 at 15; 35–36). In 1979, brothers Lester, Lawrence, and Terry Troutman signed a record contract with Rubberband Music, Inc. at the behest of Warner Bros. Records Inc., to record music as "Zapp." (Lester Troutman Decl., ECF No. 45-1 ¶ 2; *see* 1979 Zapp Record Contract, ECF No. 45-2). The 1979 Zapp Record Contract identified "the members of ZAPP" as "consisting presently of Lawrence Troutman, Lester Troutman and Terry Troutman, and of such other individual or individuals who at any given time during the term shall then comprise the Group."

In May 1981, Lester and Lawrence Troutman formed Troutman Productions, Inc., a music production company. Troutman Productions would come to sign subsequent record contracts for the Troutman brothers and produce their music. In June 1981, a month after its formation, Troutman Productions entered into a record contract with Warner Bros. for another Troutman brother, Roger Troutman, to record exclusively with Warner Bros. as "Roger." (Lester Troutman Decl., ¶ 7; *see* 1981 Roger Record Contract, ECF No. 45-5). Troutman Productions would also assume Rubberband Music, Inc.'s rights, signing a new record contract with Warner Bros. in May

1982 to grant Troutman Productions exclusive producer rights for Zapp. (Lester Troutman Decl., ¶¶ 4–5; *see* 1982 Zapp Record Contract, ECF No. 45-3). The 1982 Zapp Record Contract identified Lawrence and Lester Troutman, "individually and performing together, alone or with others, as 'ZAPP.'" It also identified Roger Troutman as Zapp's "individual producer." Finally, Troutman Productions entered into a new record contract with Warner Bros. in April 1988. (Lester Troutman Decl., ¶ 6; *see* 1988 Zapp Record Contract, ECF No. 45-4). Again, the 1988 Zapp Record Contract identified Lawrence and Lester Troutman as members of Zapp, and identified Roger Troutman as Zapp's individual producer.

The Troutman brothers were not the only performers who crafted the records of Zapp and Roger. Many Zapp and Roger records credited other musicians and vocalists. For instance, The Roger album *The Saga Continues* credited 18 background vocalists. (Lester Troutman Decl., ¶ 16; *cf.* Glover Dep. at 27 (listing certain back-up vocalists)). One of those background vocalists credited on *The Saga Continues* (along with other Zapp and Roger works) is Bobby Glover, an artist and the final remaining defendant in this case. (Glover Dep. at 22–23).

Glover came to work as a musician with Zapp and Roger through another job. The Troutman brothers owned a construction company in Dayton called Troutman Enterprises, Inc., which built residential homes in Dayton and employed many people to do so. One of these employees was Glover, who worked for Troutman Enterprises from the late 1970s through the mid-1980s. (Lester Troutman Decl., ¶¶ 12–15). During this time, Glover often recorded vocals with Zapp and Roger. (*Id.* ¶ 17).

In 1984, Glover released his own album *Bad Bobby Glover* with Columbia Records. That album was produced by the Troutman brothers. The album indicated that the Troutman brothers—but not Glover—"appear[ed] courtesy of Warner Bros." (ECF No. 45-17). Despite being the

ostensible face of the album, Glover never received royalties for *Bad Bobby Glover*. (Glover Dep. at 12).

And just as the Troutman brothers produced Glover's own album, Glover was not involved in any business decision for Zapp and Roger. Instead, he simply showed up when he was told to appear in the studio for a recording by one of the Troutman brothers. (Glover Dep. at 15–17, 27, 29).

Zapp and Roger enjoyed commercial success for many years. Their combined greatest hits album was certified platinum by the Recording Industry Association of America, indicating that it sold over a million copies. Many other Zapp albums, and one Roger album, were certified gold for selling over 500,000 copies each. (Lester Troutman Decl., ¶ 9). This commercial success ended in April 1999, when Roger and Lawrence Troutman "died in a murder-suicide." (*Id.* ¶ 10). In 2016, Lester and Terry Troutman, along with the family of Lawrence Troutman, hired LSV Entertainment to serve as an exclusive royalty administrator to collect royalties from Zapp and Roger recordings, including featured artist royalties from SoundExchange. (*Id.* ¶ 10). LSV Entertainment subsequently entered into an agreement with Roger Troutman's estate, allocating 42.5% of SoundExchange's featured artist royalties on Zapp and Roger recordings to LSV Entertainment and 57.5% to the estate of Roger Troutman. (Laurence Moelis Decl., ECF No. 45-9 ¶ 5; *see* Letter re Allocation of Artist Royalties, ECF No. 45-10). LSV Entertainment has been unable to collect on featured artist royalties for Zapp and Roger recordings from SoundExchange, however, because Bobby Glover asserted claims with SoundExchange for 40% of featured artist royalties on all Zapp and Roger recordings. (Glover Dep. at 28–29). This has resulted in over 100% of each Zapp and Roger recording's featured artist royalties being claimed. SoundExchange

will not release the featured artist royalties until Glover's claim is resolved. (Laurence Moelis Decl., ¶ 6).

### *2. Disputed Facts*

The central dispute between the parties is whether Glover was a band member of Zapp and Roger—and thus entitled to some amount of a featured artist royalty originating from 45% of digital transmission licensing—or whether he was simply a nonfeatured vocalist and musician when he performed on Zapp and Roger records by singing and clapping—and thus is entitled to some amount of a nonfeatured vocalist or musician royalty originating from a respective 2.5% of digital transmission licensing. This point is key.

Plaintiff LSV Entertainment asserts that Glover was not a member of Zapp or Roger. It relies on Lester Troutman's declaration explaining Glover's role with Zapp and Roger, where Lester Troutman explained that Glover was "a session musician or vocalist" like all other studio musicians and background vocalists that the Troutman brothers used. Lester Troutman pointed out that Glover did not have a contract with Zapp or Roger, was never paid royalties by Zapp and Roger, and had no say in the songs recorded, when the songs were released, or other creative or financial decision affecting Zapp or Roger. (Lester Troutman Decl., ¶¶ 16, 18–20). According to Lester Troutman, Glover was paid for his work recording vocals with Zapp and Roger through Troutman Enterprises as a part of his construction worker salary. (*Id.* ¶ 17).

By contrast, Glover asserts that he was a "full-fledged member of the band Zapp and Roger." (Glover Decl., ECF No. 31 ¶ 8). Indeed, in an initial sworn statement, Glover explained that he sang on, helped write, arranged the majority of the songs "on the albums Zapp, Zapp II, Zapp III, The Many Facets of Roger and [T]he Saga Continues," contributed vocals to select songs on some other later period albums, was "integral" to live performances, helped define the group's

wardrobe and dance step choreography, lent his image and likeness to promotional materials, and was never paid for his work in the studio, but "was compensated as other members of the group which [*sic*] compensation came from royalties from record sales and public performances, revenues from live performances, etc." (*Id.* ¶¶ 8–15). At a later deposition, Glover testified that he had "never" signed record contracts and could not recall signing any contract relating to Zapp or Roger. He explained that he was not involved in any of record-related business transactions, which were handled by Lawrence Troutman for Zapp and Roger. He also explained that he was "never paid for singing" or clapping his hands on those records. (Glover Dep. at 15–17, 27, 29).

**C. Procedural History**

Plaintiff LSV Entertainment filed suit against Defendants Eddie Barber, Bobby Glover, Gregory Jackson, Michael Warren, and Janetta Boyce-Warren on April 18, 2024. (ECF No. 1). Defendant Glover failed to respond timely. On June 3, 2024, the Clerk of Court entered a default against Defendant Glover. Then, on June 12, 2024, Plaintiff moved for default judgment against Defendant Glover. (ECF No. 24).

Defendant Glover moved to set aside the Clerk of Court's entry of default and file an answer instanter on July 31, 2024, arguing that he had meritorious defenses and that he could show excusable neglect for failing to respond to Plaintiff's Complaint because he suffered from memory loss and dementia. (ECF No. 31 at 4–5; *see* ECF No. 32). Specifically, Glover submitted to this Court in a sworn statement that he had "recently turned 78 years old" and "suffer[ed] from memory loss/dementia." (Glover Decl. ¶ 3). Plaintiff opposed, arguing that it would be prejudiced by continuing to incur legal fees and challenging Glover's assertion of a meritorious defense. (ECF No. 35). On March 17, 2025, this Court determined these arguments were insufficient, finding that Glover's sworn statement that he "suffers from 'memory loss/dementia'" had "provide[d] a

plausible explanation for his failure to act promptly and support[ed] his assertion that he harbored no intention to disregard the judicial process." (ECF No. 40 at 5). This Court accordingly vacated the Clerk of Court's entry of Glover's default, (*id.* at 9–10), and Glover's Answer (ECF No. 41) was docketed.

On September 1, 2025, Plaintiff filed the instant Motion for Summary Judgment, arguing that this Court should either find that Glover is not entitled to Zapp or Roger featured artist royalties from SoundExchange and grant a declaratory judgment and permanent injunction against him; or, in the alternative, strike Glover's Answer for commissioning fraud upon this Court and enter a default judgment. (ECF No. 45). Plaintiff based its alternative argument on the fact that Glover provided a sworn statement to this Court averring that he suffered from memory loss and dementia, but subsequently testified at his deposition that he did not suffer from dementia or memory loss. (*Id.* at 17–18). Glover opposed, (ECF No. 50), and Plaintiff replied. (ECF No. 51).

This Court heard oral argument on the motion on July 9, 2026, took the matter under advisement, and indicated that no further briefing would be necessary. (*See* ECF No. 54). Nevertheless, a few days later, Glover sought leave to supplement his opposition memorandum with an agreement purporting to be between Glover and Troutman Productions, Inc. and dated November 18, 1982. (ECF No. 55 at 1–2). Plaintiff opposed, (ECF No. 56), and Glover replied. (ECF No. 57).

## II. SUPPLEMENTAL BRIEFING

As a threshold matter, this Court must consider whether to accept Glover's proffered supplementation of his opposition memorandum. Generally, a motion is completely briefed once a reply brief has been filed, and "[n]o additional memoranda . . . are permitted except upon leave of court for good cause shown." S.D. Ohio Civ. R. 7.2(a)(2). Glover bases his request to

supplement the record on his belief that the 1982 Agreement that he supposedly signed with Troutman Productions, Inc. is "material evidence supporting [his] claim [that] he was a member of Zapp and Roger." (ECF No. 55 at 1). Although he recognizes "the Court's indication it did not want the record supplemented," (*id.*), he suggests that he should be permitted to supplement the record because he "was unable to locate a copy of the Agreement until now." (*Id.* at 2).

This Court will not permit Glover to supplement the record with the proffered agreement for two independent reasons. First, as Glover tacitly recognized, briefing had already closed on the summary judgment motion. A district court "may properly deny an effort to supplement the record after summary judgment . . . where the information was available at the time the motion was heard and no reasonable explanation is offered for why it was not submitted." *Koehler v. Infosys Techs. Ltd., Inc.*, 181 F.4th 769, 780 (7th Cir. 2026) (citations and internal quotation marks omitted). That is the case here. LSV Entertainment deposed Glover on July 23, 2025. During that deposition, Glover testified that he possessed a copy of a document he signed at the instruction of Lawrence Troutman's secretary at his home. He stated he could find it because he "ha[s] not thrown away anything," and Plaintiff's counsel asked that he provide a copy to his lawyer. (Glover Dep. at 29–30). That was a year ago. The discovery deadline closed in this case on August 1, 2025, and neither side sought an extension of that deadline. (ECF No. 44 at 1). Ostensibly, Glover has possessed this piece of evidence since 1982. Yet he has failed to produce it until 2026, well after discovery closed in this case. He does not offer any explanation for why he did not submit it sooner—let alone a reasonable one. Instead, he merely explains that he "failed to disclose the Agreement until oral argument . . . because he was unable to locate the document." (ECF No. 57 at 3). Even so, Glover's failure to seek relief at an earlier time is inexplicable, because he could

have sought an extension of time through Fed. R. Civ. P. 54(d)[2] if he needed additional time to locate the document. *See Taylor Acquisitions, LLC v. City of Taylor*, 313 F. App'x 826, 835 (6th Cir. 2009) ("Where a party fails to identify the material facts it hopes to uncover pursuant to Rule 56(f), a district court does not abuse its discretion in adjudicating a summary judgment motion without further discovery.").[3]

Second, "evidence submitted in opposition to a motion for summary judgment must be admissible." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997). Although they "need not themselves be in a form that is admissible at trial," "the party opposing summary judgment must show that she *can* make good on the promise . . . by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *accord Siefert v. Liberty Twp.*, 2024 WL 4100897, at *3 (6th Cir. Sept. 6, 2024). Thus, the Sixth Circuit has repeatedly emphasized that "unauthenticated documents" generally fail this admissibility requirement. *Alexander*, 576 F.3d at 558 (collecting cases). Put differently, authenticity is a precondition to admissibility, *see United States v. Farrad*, 895 F.3d 859, 875 (6th Cir. 2018) (citing *Hartley v. St. Paul Fire & Marine Ins. Co.*, 118 F. App'x 914, 921 (6th Cir. 2004)), and Glover has not "produce[d] evidence sufficient to support a finding that the item is what [he] claims it is." Fed. R. Evid. 901(a). Without any other "evidence on record that [can] serve[] to authenticate the document," the proffered 1982 Agreement is inadmissible and this Court will not accept it. *R.R.*

---

[2] "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or to take discovery; or (3) issue any other appropriate order."

[3] *Taylor* interpreted the predecessor Rule 56(f), which became Rule 56(d). "Subdivision (d) carries forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment.

*Mgmt. Co. v. CFS La. Midstream Co.*, 428 F.3d 214, 219–20 (5th Cir. 2005); *see Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 427 (6th Cir. 2014) (no abuse of discretion where district court refused to consider document "on the basis that it was not properly authenticated"). In sum, Glover has not authenticated the proffered 1982 Agreement because he has submitted no affidavit or declaration to provide foundation for this piece of evidence or otherwise explained how it would be admissible. *E.g.*, *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 777 n.19 (9th Cir. 2002) (exhibits purporting to be letters "are not authenticated" and "are thus inadmissible").

For these two reasons, Defendant Glover's Motion to Supplement his Memorandum in Opposition (ECF No. 55) is **DENIED**. This Court need not and will not evaluate whether the proffered document would otherwise create a genuine issue of material fact precluding summary judgment, given that the motion for summary judgment was fully briefed and oral argument had already been heard before the document was offered.[4]

## III. SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, the court's function is not "to weigh evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Courts ask whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Summary judgment is inappropriate "if

[4] It is worth noting that the supposed agreement appears to be for Bobby Glover's own performance as an "Artist," and nowhere does it mention Zapp or Roger.

the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248. In such a case, there is an issue for trial because "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," but evidence that is "merely colorable" or "not significantly probative" is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment carries the initial burden of presenting law and argument in support of its motion, as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotext Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). "If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial." *Hines v. Humana Ins. Co.*, 689 F. Supp. 3d 516, 525 (S.D. Ohio 2023) (Marbley, J.) (citing Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250).

Factual evidence is viewed "in the light most favorable to the non-moving party," and "all reasonable inferences" are drawn in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). A mere "scintilla" of evidence supporting the nonmoving party's position is insufficient—"there must be evidence on which the jury could reasonably find for the [nonmovant]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

**B. Applicable Rule**

It is undisputed that Glover performed in some capacity for Zapp and Roger; rather, the parties dispute only whether he was a featured artist or simply a nonfeatured vocalist/musician. The threshold problem is that "no statutory provision defines . . . the phrase 'the recording artist or artists featured on such sound recording' or any of the phrase's constituent parts." *Ithier v.*

*Aponte-Cruz*, 105 F.4th 1, 7 (1st Cir. 2024) (quoting 17 U.S.C. § 114(g)(2)(D)); *see* M. LaFrance, *Authorship and Termination Rights in Sound Recordings*, 75 S. Cal. L. Rev. 375, 405 n.110 (2002) ("[S]tatutory categories such as 'featured' and 'nonfeatured' . . . are open to much interpretation."). Instead, SoundExchange defines featured artists as artists that are "prominently featured on a track or album," whereas non-featured artists are artists who are "not prominently featured on a track or album (i.e. a session musician or a back-up vocalist)."[5] Some courts afford weight to SoundExchange's definition. *E.g.*, *Blondell v. Bouton*, 2019 WL 12338323, at *2 (E.D.N.Y. Mar. 29, 2019).

In *Ithier*, the First Circuit reasoned that a featured artist on a recording would make sense "to refer to each of the individual members of that band," as such a construction would not render either subsection 114(g)(2)(B) or 114(g)(2)(C) "superfluous" in addressing nonfeatured musicians and nonfeatured vocalists. *Ithier*, 105 F.4th at 9. This Court finds that First Circuit's reasoning persuasive, and consistent with the parties' apparent agreement on the weight of *Ithier* and SoundExchange's definition, (*see* ECF Nos. 45 at 7–8; 50 at 7), will interpret a featured artist to be an individual artist who is prominently featured on a track or album, and interpret a nonfeatured vocalist/musician to be individual artists who are not prominently featured on that track or album. To the extent that a band is featured on a track or album, and that band's membership can be clearly ascertained, membership in the band may be crucial in making this determination. As the First Circuit noted, "there is some intuitive appeal to the notion that Congress did not use the word 'featured' to equate a star like Lennon or McCartney with a session musician like Frederick

[5] SoundExchange, *Frequently Asked Questions*, available at https://www.soundexchange.com/frequently-asked-questions/ ("What is a Featured Artist?") (last visited July 8, 2026).

Alexander (who played the cello for 'Martha My Dear' on the White Album)." *Ithier*, 105 F.4th at 9–10.

Plaintiff advances several arguments in support of its motion for summary judgment. First, it seeks summary judgment across the board, contending that Glover cannot show a genuine issue of material fact as to whether he was a featured artist. In the alternative, Plaintiff also seeks a narrower ruling, addressing only the recordings that Glover did not perform on. This Court takes up each argument in turn.

**C. Complete Summary Judgment**

Plaintiff provides three reasons why it believes summary judgment is warranted across the board. *First*, Plaintiff contends that Glover's own testimony demonstrates that he is "a session backup vocalist" with "no participation or involvement in either the *business or creative* decision made by the featured artists" in Zapp and Roger. Plaintiff cites Glover's own testimony about his lack of knowledge with respect to the bands' business decisions and album compositions, as well as his admissions that he never received a contract or royalties. Plaintiff points to Zapp's contracts as demonstrating that Glover was never a member of the band. Plaintiff relies on the expert declaration of SoundExchange founder John Simson and points to the legislative history of the Copyright Act, suggesting that Glover cannot be a featured artist unless identified with prominence on band records. (ECF No. 45 at 8–11).

*Second*, Plaintiff argues that Glover cannot be entitled to royalties from Roger because Roger "was marketed as a solo artist as only Roger Troutman's name and image appear on all Roger album covers." Plaintiff contends that because Roger was marketed as one artist, it is only one artist. It points to a deposition response from Glover answering a question about Roger's

"greatest hits album" and referring to Roger as an individual. Plaintiff also points out that Glover is absent from Roger's record contract. (*Id.* at 11–12).

*Third*, Plaintiff suggests that Glover's claim to be a member of Zapp and Roger, which were exclusively signed to Warner Bros., cannot be reconciled with his release of the *Bad Bobby Glover* album in 1984 with Columbia Records. LSV Entertainment observes that Glover's album noted Warner Bros. had granted permission for the Troutman brothers (exclusively signed as members of Zapp and Roger) to perform on Glover's album, and that the Roger album *The Saga Continues* shows that Glover appeared courtesy of his record label. To Plaintiff, "Glover cannot *be Roger* if he needed permission from a third party to record *with Roger*." (*Id.* at 12–13).

Glover raises a slew of counterarguments to Plaintiff's motion. He attempts to undermine Plaintiff's expert declaration, argues that he is not precluded from featured artist royalties as a band member simply because he is not the eponymous lead of the band (as was Roger Troutman for Roger), and observes that Plaintiff's Zapp contracts do not reflect all the Troutman brothers as signatories, omitting Roger Troutman. He explains away his Columbia Records contract by speculating that the Troutman brothers "were not candid with Warner Bros. about Glover's membership in 'Zapp' during the group's early years" and suggests that the Troutman brothers failed to honor his trust in them "to do what was right and address the business affairs of the groups." He argues that he was involved in creative decisions by the songwriting and arranging of most of the songs on *Zapp*, *Zapp II*, *Zapp III*, *The Many Facets of Roger*, and *The Saga Continues*. He also argues that he toured with the group extensively in the 1980s, participated in every *Zapp* performance during this time period, had his image used to promote and market Zapp, performed exclusively with Zapp and Roger until his solo career, had significant creative input into Zapp and Roger, including songwriting, live and studio performances, choreography, and

wardrobe design. Finally, he states that he received Gold Records from the Recording Industry Association of America, which would not be given to session performers. (ECF No. 50 at 7–11).

In reply, Plaintiff notes that Glover failed to respond to its Rule 56 statement of undisputed facts, arguing that summary judgment should be granted on those facts. (ECF Nos. 51 at 2–3; 45-19). Plaintiff also dismisses Glover's counterarguments regarding his trust in the Troutman brothers or his purported creation of the bands' wardrobe, appearances, or dance moves, as well as his purported performing, touring, and songwriting for the bands, arguing that all these assertions lack an evidentiary basis. (ECF No. 51 at 5–6). Plaintiff rejects Glover's hypothesis about how he could release *Bad Bobby Glover* with Columbia Records as speculation, argues that Roger is a solo artist because his albums "were marketed as solo albums," and proposes a negative inference should be drawn from Glover's failure to produce a Zapp contract he referenced as within his possession during his deposition. (*Id.* at 7–12).

As to these threshold matters raised by Plaintiff's reply, Plaintiff is correct that Glover failed to engage with its statement of undisputed facts. *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion."). True, this is not a case where Glover has entirely failed to respond in substance. *Compare Jones v. City of Franklin*, 677 F. App'x 279, 285 (6th Cir. 2017). Glover does dispute whether he was a member of Zapp and Roger, but he mostly raises hypotheticals and speculation. (*See* ECF No. 51 at 2). This Court simply will not consider Glover's counterarguments that are without evidentiary support and lack record citations to evidence or LSV Entertainment's position. S.D. Ohio Civ. R. 7.2(b)(3) ("[A]ll filings in this Court that reference a prior filing *must* provide pinpoint citations.") (emphasis added). Glover has failed to present his unsupported arguments

properly. Similarly, Glover's speculation about how his Columbia Records contract for *Bad Bobby Glover* can be reconciled with his asserted membership in Zapp and Roger is just that—unfounded speculation. It is insufficient to survive a motion for summary judgment, and this Court will not entertain it. *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008).

Turning to Plaintiff's three core reasons advanced for summary judgment, this Court finds there to be no genuine issue of material fact that Glover was a session backup vocalist with no participation or involvement in either the business or creative decision made by the featured artists in Zapp and Roger. Glover's own testimony confirms that he was not involved in the business decisions of those artists. And while Glover submitted a sworn statement that he "was instrumental in defining the group's onstage wardrobe and the choreography of dance steps," (Glover Decl. ¶ 11), that does not bear on whether he was featured or nonfeatured for the purposes of this inquiry.

Rather, the Zapp, Roger, and Bobby Glover contracts and Simson's expert opinion interpreting the Copyright Act show that Glover was not a featured artist for Zapp or Roger. That is the only possible explanation for why the Troutman brothers, as the band members and featured artists of Zapp and Roger, had to receive permission from Warner Bros. to record on *Bad Bobby Glover*, while Bobby Glover did not. (*See* ECF No. 45-18 at 4–5). The existence of Glover's solo album *Bad Bobby Glover*, and the fact that Glover signed it with Columbia Records in apparent contradiction with the record contracts of Zapp and Roger is of paramount significance. While the Copyright Act does not preclude Glover from being a member of two or more bands, *see Ithier*, 105 F.4th at 12 ("being the featured artist on a solo album is not in tension with also receiving statutory royalties as a member of a band—and thus also as one of the featured artists—on a band's album"), Glover has no explanation for how or why he could produce his solo album *Bad Bobby Glover* with Columbia Records while also being a featured artist with Zapp and Roger,

whose albums were produced by Warner Bros. Roger's *The Saga Continues*, which listed Glover as appearing courtesy of his record label, is consistent with and supports that Glover was not a member or featured artist on Roger but instead was a guest performer on some Roger albums. That interpretation is further supported by Glover's deposition response referring to Roger as a "he." (Glover Dep. at 32).

To be sure, it appears uncontroverted that Glover had no business or managerial role with Zapp and Roger, and his artistic contribution on Zapp and Roger recordings was that of a back-up vocalist. (*See* Glover Dep. at 12, 15–17, 22–24, 27, 29, 33–36).[6] There is no question that Glover was not a band member of Zapp or Roger and was not a featured artist for the purposes of the Copyright Act. At most, Glover points to some of his own testimony to suggest that there is a genuine issue of material fact. But his testimony is self-serving, without record support, and contradicts his prior sworn submissions to this Court. Under such circumstances, to the extent that Glover testified or otherwise swore to facts that might conflict with the record, it is hard to see how such "wholly . . . self-serving statements" can "be sufficient to survive summary judgment" in light of the developed record that appears to flatly contradict those statements. *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020). This is particularly so where Glover's own sworn statements to this Court are directly contradictory. So this Court does not and will not afford

[6] At his deposition, Glover recalled singing background vocals on albums *Zapp*, *Zapp II*, *Zapp III*, and *The Saga Continues*. He also believed he sang background vocals on the album *Zapp V*. For the album Bridging the Gap, he recalled singing on the songs *Mo' Bounce to the Ocean*, *Be Alright*, *I Heard it Through the Grapevine*, *So Ruff, So Tuff*, *Do It Roger*, *Dance Floor*, and *Been This Way Before*. He believed he may have sung on *Ooh Baby Baby*. He could not recall singing on the albums *Zapp IV U* and *Roger Unlimited*. He also could not recall singing *Rock Star*, *Fire*, *Stop That*, *Jesse Jackson*, *Ain't the Thing to Do*, *Sad Day Moaning*, *California Love*, or *Back to Bass-iks*.

weight to Glover's standalone statements that lack any evidentiary or record support, which appear insufficient at any rate to create a *genuine* issue of *material* fact.

Glover cannot make contradictory sworn statements or selectively put his memory into question and at other times rehabilitate it and then expect this Court to accept his sworn statements as creating genuine issues of material fact in this matter. *See* Section IV(C), *infra*.

Plaintiff's request for complete summary judgment is **GRANTED**.

**D. Partial Summary Judgment**

Finally, Plaintiff alternatively argues that because featured artist determinations are made on a track-by-track basis, 17 U.S.C. § 114(g)(2)(d), it should receive summary judgment with respect to the recordings that Glover did not perform on. (ECF Nos. 45 at 13–15; 51 at 3–4).

Glover concedes that he is only entitled to featured artist royalties for the sound recordings on which he performed, but counters that "LSV's very brief deposition of Glover coupled with the self-serving testimony of Lester Troutman are not dispositive, especially considering Glover's numerous contributions to the groups." He points to his "numerous contributions" to Zapp and Roger generally as a recording artist, live performer, songwriter, choreographer, and wardrobe designer. (ECF No. 50 at 9).

The problem for Glover's position with respect to these specific tracks is that the Plaintiff offered evidence and Glover offered none. Moreover, Glover concedes that "all determinations of whether a recording artist is a featured artist are made on a track-by-track basis." (ECF No. 50 at 7). Thus, Glover's general references to contributions that are not connected to specific records cannot manufacture genuine issues of material fact to preclude summary judgment on those specific records.

Even if this Court had not found that Plaintiff was entitled to complete summary judgment, Plaintiff would be entitled to partial summary judgment on the following identified tracks, where Plaintiff presented evidence that Glover was not an artist, and Glover failed to challenge that evidence or show a genuine issue of material fact:

| Track | Artist | Album | Source |
|---|---|---|---|
| California Love | Roger | Single | Glover Tr., 33:22-25, 35:3-4 |
| Computer Love | Zapp & Roger, Zapp | All the Greatest Hits; The New Zapp IV U | Lester Troutman Decl. ¶ 27 |
| Heart Breaker | Zapp & Roger, Zapp | All the Greatest Hits; Zapp III | Lester Troutman Decl. ¶ 27 |
| I Want to Be Your Man | Zapp & Roger, Roger | All the Greatest Hits; Unlimited! | Lester Troutman Decl. ¶ 27 |
| More Bounce to the Ounce | Zapp & Roger, Zapp | All the Greatest Hits; Zapp | Lester Troutman Decl. ¶ 27 |
| Slow and Easy | Zapp & Roger | All the Greatest Hits | Lester Troutman Decl. ¶ 27 |
| So Ruff So Tuff | Zapp & Roger, Roger | All the Greatest Hits; The Many Facets of Roger | Lester Troutman Decl. ¶ 27 |
| I Want to Be Your Man | Roger | Unlimited! | Glover Tr., 24:22-23; Lester Troutman Decl. ¶¶ 15, 49 |
| Night and Day | Roger | Unlimited! | Glover Tr., 24:22-23; Lester Troutman Decl. ¶¶ 15, 49 |
| Been This Way Before (Rap) | Roger | Unlimited! | Glover Tr., 24:22-23; Lester Troutman Decl. ¶¶ 15, 49 |
| Composition to Commemorate | Roger | Unlimited! | Glover Tr., 24:22-23; Lester Troutman Decl. ¶¶ 15, 49 |
| Papa's Got a Brand New Bag | Roger | Unlimited! | Glover Tr., 24:22-23; Lester Troutman Decl. ¶¶ 15, 49 |
| Thrill Seekers | Roger | Unlimited! | Glover Tr., 24:22-23; Lester Troutman Decl. ¶¶ 15, 49 |
| Tender Moments | Roger | Unlimited! | Glover Tr., 24:22-23; Lester Troutman Decl. ¶¶ 15, 49 |

| | | | |
|---|---|---|---|
| If You're Serious | Roger | Unlimited! | Glover Tr., 24:22-23; Lester Troutman Decl. ¶¶ 15, 49 |
| Private Lover | Roger | Unlimited! | Glover Tr., 24:22-23; Lester Troutman Decl. ¶¶ 15, 49 |
| I Really Want To Be Your Man | Roger | Unlimited! | Glover Tr., 24:22-23; Lester Troutman Decl. ¶¶ 15, 49 |
| (Everybody Get Up) | Roger | Bridging the Gap | Glover Tr., 23:06-12; Lester Troutman Decl. ¶¶ 15, 51 |
| Take Me Back | Roger | Bridging the Gap | Glover Tr., 23:06-12; Lester Troutman Decl. ¶¶ 15, 51 |
| Curiosity | Roger | Bridging the Gap | Glover Tr., 23:06-12; Lester Troutman Decl. ¶¶ 15, 51 |
| You Should Be Mine | Roger | Bridging the Gap | Glover Tr., 23:06-12; Lester Troutman Decl. ¶¶ 15, 51 |
| Emotions | Roger | Bridging the Gap | Glover Tr., 23:06-12; Lester Troutman Decl. ¶¶ 15, 51 |
| Break Through | Roger | Bridging the Gap | Glover Tr., 23:06-12; Lester Troutman Decl. ¶¶ 15, 51 |
| Love Incorporated | Roger | Bridging the Gap | Glover Tr., 23:06-12; Lester Troutman Decl. ¶¶ 15, 51 |
| Victim of Love | Roger | Bridging the Gap | Glover Tr., 23:06-12; Lester Troutman Decl. ¶¶ 15, 51 |
| Who-La-Boola | Roger | Bridging the Gap | Glover Tr., 23:06-12; Lester Troutman Decl. ¶¶ 15, 51 |
| Hurry Up | Roger | Bridging the Gap | Glover Tr., 23:06-12; Lester Troutman Decl. ¶¶ 15, 51 |
| It Doesn't Really Matter | Zapp | The New Zapp IV U | Glover Tr., 24:8-9; Lester Troutman Decl. ¶¶ 15, 38 |
| Computer Love | Zapp | The New Zapp IV U | Glover Tr., 24:8-9; Lester Troutman Decl. ¶¶ 15, 38 |

| | | | |
|---|---|---|---|
| Itchin' For Your Twitchin' | Zapp | The New Zapp IV U | Glover Tr., 24:8-9; Lester Troutman Decl. ¶¶ 15, 38 |
| Radio People | Zapp | The New Zapp IV U | Glover Tr., 24:8-9; Lester Troutman Decl. ¶¶ 15, 38 |
| I Only Have Eyes For You | Zapp | The New Zapp IV U | Glover Tr., 24:8-9; Lester Troutman Decl. ¶¶ 15, 38 |
| Rock 'N' Roll | Zapp | The New Zapp IV U | Glover Tr., 24:8-9; Lester Troutman Decl. ¶¶ 15, 38 |
| Cas-Ta-Spellome | Zapp | The New Zapp IV U | Glover Tr., 24:8-9; Lester Troutman Decl. ¶¶ 15, 38 |
| Make Me Feel Good | Zapp | The New Zapp IV U | Glover Tr., 24:8-9; Lester Troutman Decl. ¶¶ 15, 38 |
| Ja Ready To Rock | Zapp | The New Zapp IV U | Glover Tr., 24:8-9; Lester Troutman Decl. ¶¶ 15, 38 |
| Ooh Baby Baby | Zapp | Zapp Vibe | Lester Troutman Decl. ¶¶ 15, 41 |
| I Play That Box | Zapp | Zapp Vibe | Lester Troutman Decl. ¶¶ 15, 41 |
| Stop That | Zapp | Zapp Vibe | Glover Tr., 33:22-25, 34:5-14; Lester Troutman Decl. ¶¶ 15, 41 |
| Fire | Zapp | Zapp Vibe | Glover Tr., 33:22-25, 34:3-4; Lester Troutman Decl. ¶¶ 15, 41 |
| Back to Bass-iks | Zapp | Zapp Vibe | Glover Tr., 33:22-25, 34:5-6; Lester Troutman Decl. ¶¶ 15, 41 |
| Jesse Jackson | Zapp | Zapp Vibe | Glover Tr., 33:22-25, 34:20-21; Lester Troutman Decl. ¶¶ 15, 41 |
| Ain't The Thing To Do | Zapp | Zapp Vibe | Glover Tr., 33:22-25, 34:22-23; Lester Troutman Decl. ¶¶ 15, 41 |

| | | | |
|---|---|---|---|
| Sad-day Moaning | Zapp | Zapp Vibe | Glover Tr., 33:22-25, 35:1-2; Lester Troutman Decl. ¶¶ 15, 41 |
| Rock Star | Zapp | Zapp Vibe | Glover Tr., 33:22-25, 34:1-2; Lester Troutman Decl. ¶¶ 15, 41 |
| Jake E Stanstill | Zapp | Zapp Vibe | Lester Troutman Decl. ¶¶ 15, 41 |

Glover has not articulated a reason why summary judgment should not be granted on those tracks, and has offered no evidence to show that he was a featured artist on them or even contributed to them. In fact, Glover appears tacitly to concede that "he is only entitled to featured artist royalties for the sound recordings on which he performed," and nowhere does he counter Plaintiff's position that he did not participate as an artist on the above-listed tracks—rather, he only argues that "LSV's very brief deposition of Glover coupled with the self-serving testimony of Lester Troutman are not dispositive, especially considering Glover's numerous contributions to the groups." (ECF No. 50 at 9). Because Glover entirely failed to address LSV Entertainment's arguments about these specific tracks, his opposition to summary judgment on these tracks is waived. *E.g.*, *7D Holdings, LLC v. Jawk Holdings LLC*, 2026 WL 2364173, at *5 (W.D. Ky. Aug. 14, 2026) (At summary judgment, a party waives opposition to an argument by failing to address the argument in a responsive brief.); *accord Benahmed v. Houston Cas. Co.*, 486 F. App'x 508, 515 (6th Cir. 2012); *see generally McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Accordingly, summary judgment is also separately **GRANTED** in Plaintiff LSV Entertainment's favor with respect to the identified tracks. Glover has waived any argument that

he was a featured artist on any of these recordings by failing to engage with Plaintiff's argument here, and there does not appear to be any genuine issue of material fact as to whether he performed on those tracks as a featured artist(or even made a contribution to them).

## IV. SANCTIONS

### A. Standard of Review

Next, this Court turns to Plaintiff's alternative request that Glover's answer be stricken as a sanction for fraud. Federal Rule of Civil Procedure 11 provides that an attorney or party who "present[s] to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it," "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that the paper "is not being presented for any improper purpose," and "the factual contentions [contained therein] have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(1), (3). If a court determines that Rule 11 has been violated, "the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). The court may impose Rule 11 sanctions on its own initiative. Fed. R. Civ. P. 11(c)(3).

Separately, federal courts have the inherent authority "to vacate [a] judgment upon proof that a fraud has been perpetrated upon the court," as the "historic power of equity to set aside fraudulently begotten judgments is necessary to the integrity of the courts." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (citations and internal quotation marks omitted). To show fraud on the court, a movant must show *conduct*: (1) on the part of an officer of the court; that (2) is directed to the judicial machinery itself; (3) is intentionally false, willfully blind to the truth, or is in reckless

disregard of the truth; (4) is a positive averment or a concealment when one is under a duty to disclose; and (5) deceives the court. *Williamson v. Recovery Ltd. P'ship*, 826 F.3d 297, 301–02 (6th Cir. 2016). The movant bears "the burden of proving existence of fraud on the court by clear and convincing evidence." *Johnson v. Bell*, 605 F.3d 333, 339 (6th Cir. 2010).

In determining and imposing an appropriate sanction, federal courts "must comply with the mandates of due process." *Chambers*, 501 U.S. at 50. This does not necessitate a full evidentiary hearing, but merely requires notice and an opportunity to be heard on the record. Fair notice can come from an opposing party's motion. *Metz v. Unizan Bank*, 655 F.3d 485, 491 (6th Cir. 2011).

**B. Parties' Arguments**

Plaintiff argues that even if this Court does not grant the motion for summary judgment, it should alternatively strike Glover's Answer because of Glover's false representations which informed the March 17, 2025 Opinion and Order setting aside the default judgment and permitting him to file his Answer late. (ECF No. 45 at 15–19). Plaintiff points to two instances where Glover's sworn statements are inconsistent: Glover's contradictions regarding his memory, and his contradictions regarding receipt of royalties as a form of payment. *First*, Glover averred that he suffered from memory loss and dementia in seeking to set aside the entry of default, (Glover Decl. ¶ 3), but later, during his deposition, he testified that he did not suffer from dementia or "any condition that would affect [his] memory." (Glover Dep. at 7–8). *Second*, Glover also averred that he was compensated with "royalties from record sales and public performances, revenues from live performances, etc." to justify setting aside the default, (Glover Decl. at ¶ 15), but then testified that he "was never paid" in such a way and, curiously, never had any expectation that he would be paid, (Glover Dep. at 16–17; *see id.* at 30–31). At his deposition, Glover confirmed that he had signed his declaration submitted to this Court. (*Id.* at 25–26).

Plaintiff contends that Glover's false statements under oath constitute clear and convincing evidence of an attempt at fraud upon judicial proceedings, and should be sanctioned via default. Plaintiff offers a lengthy string citation of authorities for this proposition, though all the cases are multiple decades old, most predate the Supreme Court's opinion in *Chambers*, and only one 1986 district court opinion comes from this circuit. (ECF No. 45 at 16, 19). In response, Glover counters that Plaintiff has failed to surmount the high evidentiary requirement of clear and convincing evidence to show that Glover perpetrated an "unconscionable scheme" on the judiciary. (ECF No. 51 at 11). Glover points out that he is not a doctor, and argues that his deposition was short, "addressed limited issues," and revealed that he could not recall certain facts, including the year he graduated from college. (*Id.* at 1–2, 11–12). Plaintiff retorts that Glover has failed to address a serious matter, and that (re)entry of a default judgment is an appropriate remedy in light of Glover's apparent perjury. (ECF No. 51 at 13–14).

**C. Analysis**

It is true that Glover's sworn declaration and deposition testimony are at odds with respect to his representations regarding his memory, dementia, and receipt of pay for his work with Zapp and Roger. Glover's deposition testimony, however, was contradictory on several points in a manner which might not be inconsistent with an octogenarian suffering from memory loss that might be expected as one ages. For instance, Glover momentarily struggled to identify his current address, could not recall if he had lived there for thirty or forty years, could not recall how long he had worked for Troutman Enterprises, and could not recall whether he had graduated from Miami University in 1968 or 1969. (Glover Dep. at 8–11).

Still, the conduct of Glover and his defense counsel could be sanctionable. First, under Rule 11, Glover's signed, sworn submission to this Court plainly contained factual assertions

lacking evidentiary support. And defense counsel's signature on Glover's motion to set aside the default judgment "certifie[d] to the court that [counsel] has read the document, has conducted a reasonable inquiry into the facts and the law and is satisfied that the document is well grounded in both." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 542 (1991). Defense counsel had an affirmative duty "to investigate" Glover's claimed dementia and memory loss "prior to the subscription and submission of any pleading, motion or paper." *Id.* at 545 (citation and internal quotation marks omitted); *see Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 398 (1990) (filing "motions without taking the necessary care in their preparation is [an] abuse of the judicial system"). Attorneys have professional and ethical obligations to the tribunal which include ensuring to the best of their ability that their representations and submissions are accurate, *see Quandel Constr. Grp., Inc. v. Hunt Constr. Grp., Inc.*, 2026 WL 878986, at *7 (S.D. Ohio Mar. 31, 2026) (Marbley, J.), and the apparent contradiction in Glover's sworn statements is at least some quantum of evidence suggesting that defense counsel failed to inquire into the facts surrounding Glover's sworn statement submitted to this Court. Moreover, Glover and defense counsel certainly owe this Court *some* explanation for the glaring inconsistency between the sworn statements Glover submitted to set aside the default judgment and his sworn deposition testimony. Glover's opposition brief doubles down on his earlier sworn statement that he *does* suffer from memory issues, despite his intervening deposition testimony, which stated the opposite. (ECF No. 50 at 11). Glover's glib assertion that he "obviously is not a doctor" fails to recognize the serious obligations that *both* Glover and his attorney had in making representations to this Court—sworn or otherwise. (*Id.*).

Glover cannot have it both ways—he either suffers from memory issues and dementia, or he does not. He claimed these issues when it was convenient to set aside the default judgment, but

then claimed not to suffer from these issues during his deposition when he was testifying to his experiences with Zapp and Roger. It would be quite convenient for Glover to be able to claim memory issues and dementia to avoid defaulting, but squash any question about the veracity of his testimony or his ability to recall facts from decades ago. Either way, Glover and his attorney represented to this Court that he did suffer from dementia and memory loss to vacate entry of default. It is not enough for Glover now to undercut his own prior sworn statement to this Court by claiming that he is not a doctor—Rule 11(b) demands more from both him and his attorney in making representations to this Court, including a "continuing responsibility to review and reevaluate" prior representations made to this Court and, if necessary, conform them. *Bojicic v. DeWine*, 145 F.4th 668, 671 (6th Cir. 2025).

Plaintiff has not requested Rule 11 sanctions, and this Court analyzes Rule 11's requirements *sua sponte* for their animating background principles. Instead, Plaintiff requests that Glover's Answer be stricken pursuant to this Court's inherent authority, and this Court grant a default judgment in Plaintiff's favor. To be sure, entry of default may be an appropriate sanction "as a result of defendant's elaborate scheme involving perjury designed to deceive the court." *Wolfe v. GC Servs. Ltd. P'ship-Del.*, 2009 WL 230637, at *8 (E.D. Mich. Jan. 30, 2009) (citing *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987)). But here, entry of a default judgment would be premature where Plaintiff has not briefed whether default judgment would be proper. *E.g.*, *Artin Printing Co. v. Four Colour Imports, Ltd.*, 2026 WL 2446652, at *2 (W.D. Ky. Aug. 20, 2026) ("[W]hen moving for a default judgment, the plaintiff must prove its entitlement" to the relief sought."); *Huntington Nat'l Bank v. Secure Assets, Inc.*, 2026 WL 2529406, at *1 (S.D. Ohio Aug. 27, 2026) (Marbley, J.) (the omission of the seven *Eitel*/*Russell* factors is fatal to a request for default judgment) (citing, *inter alia*, *Russell v. City of Farmington Hills*, 34 F. App'x

196, 198 (6th Cir. 2002); *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986)). And Plaintiff has also failed to address the five requirements that courts in the Sixth Circuit must evaluate to determine whether fraud on the court has been shown. *See Williamson*, 826 F.3d at 301–02. So this Court will deny Plaintiff's request to strike Glover's Answer, but without prejudice to its renewal on a properly-supported motion.

## V. CONCLUSION

For the foregoing reasons, Plaintiff LSV Entertainment, LLC's Motion for Summary Judgment (ECF No. 45) is **GRANTED** in part and **DENIED** in part. It is **GRANTED** to Plaintiff with respect to Defendant Bobby Glover's capacity on Zapp and Roger recordings—Glover was not a featured artist within the meaning of the Copyright Act when he performed with Zapp and Roger. It is also **GRANTED** with respect to the 46 identified tracks where Glover does not dispute that he was not a featured artist. To the extent that Plaintiff asks this Court to strike Glover's Answer as a sanction, that request is **DENIED without prejudice**. Any renewed motion to strike or motion for sanctions must be filed within 28 days of the date of this Order, and set forth the legal basis for the requested relief.

Defendant Glover's Motion to Supplement (ECF No. 55) is **DENIED**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: September 30, 2026**